COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges O'Brien, Malveaux and Raphael

ALBEMARLE COUNTY DEPARTMENT
 OF SOCIAL SERVICES

                                                MEMORANDUM OPINION*
v.        Record No. 0791-23-2                         PER CURIAM
                                                     OCTOBER 1, 2024
SHELLY WILSON, ET AL.


FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
Cheryl V. Higgins, Judge

(J. Curfman, Senior Assistant County Attorney; B. Stephanie
Commander, Guardian ad litem for the minor child, on briefs), for
appellant.  Appellant and Guardian ad litem submitting on briefs.

(Angela H. Williams; Pamela R. Johnson; HarperWilliams PLLC, on
brief), for appellees.  Appellees submitting on brief.


The Albemarle County Department of Social Services (the Department) appeals the circuit

court's orders denying petitions for the termination of Shelly (mother) and Keith (father) Wilson's

parental rights to L.W. and rejecting the foster care goal of adoption.  The Department contends that

the court erred in finding that the conditions that resulted in harm to L.W. could be substantially

corrected or eliminated within a reasonable period of time under Code § 16.1-283(B).  The

Department also asserts that the court erred in denying the petition to terminate mother's and

father's parental rights under Code § 16.1-283(C)(2) when it found that termination of their parental

rights was in the best interests of the child.  The parents assign cross-error to the court's finding that

termination of their parental rights was in L.W.'s best interests.  For the following reasons, we

affirm.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND[1]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 550-51 (2018) (quoting *Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157, 168 (2014)). Here, the parents prevailed below.

Mother and father are L.W.'s biological parents. Mother has an older child, B.C., and father has an older child, J.W., neither of whom is involved in this appeal. The Department first became involved with the family in 2015, after receiving reports of abuse and neglect of B.C. The Department provided ongoing services to the family for eight months. Thereafter, it received additional complaints of domestic violence, physical neglect, and sexual abuse in the family. The Department referred the family to services and recommended counseling, but the parents initially declined to participate. Mother "insisted" that the family did not need services.

On December 1, 2018, the Albemarle County police responded to the family's home after receiving a report that father strangled mother. Five-year-old L.W. and nine-year-old B.C. witnessed the incident. The police arrested father, who later pleaded guilty to misdemeanor assault and battery.

Due to the family's history and parents' lack of cooperation with services, the Department petitioned to remove L.W. from the home in January 2019.[2] After entering emergency and preliminary removal orders, the Juvenile and Domestic Relations District Court of the County of

---

[1] The record in this case was sealed. "[T]his appeal requires unsealing certain portions to resolve the issues raised by the parties." *Mintbrook Devs., LLC v. Groundscapes, LLC*, 76 Va. App. 279, 283 n.1 (2022). We unseal only the facts mentioned in this opinion; the rest of the record remains sealed. *Id.*

[2] The Department also removed B.C. from the home in January 2019, but B.C. returned home in July 2020.

Albemarle (JDR) held that L.W. was abused or neglected and entered a dispositional order, placing her in foster care.

The Department established requirements for the parents to complete before they could be reunited with L.W. It required them to maintain a safe and stable home, free from abuse, neglect, and violence. Mother and father also had to demonstrate that they could provide for L.W.'s needs and were committed to reunification by attending all visitations and cooperating with the Department and other service providers. The Department required each parent to first participate in individual therapy and later in couples and family counseling.

Mother participated in individual therapy at least once, sometimes twice, a week. Initially, she was "emotional and reactive and sometimes angry," but as therapy continued, mother's counselor found her to be "more thoughtful, coherent," and "more peaceful," as she reduced the "intensity of [her] emotions." At the circuit court hearing, the counselor noted a "huge improvement" and had no concerns with mother's behavior.

Likewise, father "consistently" participated in weekly counseling. Father first worked on his "anger issues" and "domestic issues," including marriage difficulties and the children entering foster care. He later focused on his "parenting issues" and ways to "improve his ability to be a good[,] secure base for his family." At the circuit court hearing, his counselor observed that father had come "a really long way just growing as a husband, as a father" and had no concerns with a trial home placement.

Mother and father also participated in couples and family counseling, which helped them improve their communication. They completed joint therapy in July 2020, after they had made "pretty significant progress," and domestic violence was no longer a concern. The therapist was "[v]ery confident" in the parents' ability to work with each other in resolving any conflicts. The

therapist observed them with L.W. and believed that they were attentive to her emotional needs and had a "healthy attachment."

The Department arranged for supervised visitation between the parents and L.W., which progressed to twice weekly visits in the family home, both supervised and unsupervised. The parents consistently participated in the visits and were responsive to feedback, which the Department described as "positive."

The Department acknowledged that mother and father had stable housing, employment, and transportation and had maintained contact with the Department. Both parents had demonstrated that they were receptive to and cooperative with services. About a year after L.W.'s placement in foster care, parents' therapists advocated for more visitation and a trial home placement, but the Department instead sought an attachment evaluation to examine their relationship and emotional bond with L.W. The Department acknowledged that the attachment evaluation and therapy usually take "years" to complete.

The parents completed the attachment evaluation in April 2020 and started attachment therapy. They worked on "learning how to better read their children's cues." The attachment therapist found that mother was "resilient" and "worked hard" at integrating what she learned. The therapist also found that father implemented what he learned and that he was "a strength and quiet presence for his family."

In January 2021, the parents participated in a second attachment evaluation. Notwithstanding the parents' progress, the therapist believed that they were not "ready to emotionally support [L.W.] in the way that she needed." For example, father did not always intervene when mother "became dysregulated" and did not "protect the children" as the therapist wished. But the Department had no other concerns about father, and the therapist noted that he was improving by taking a "more active role." Regardless, the therapist believed that mother

- 4 -

and father needed "an additional two years" of therapy and placing L.W. in their home "prematurely would lead to emotional neglect." She explained that there was a "high risk" of the parents' "caregiving capacity" to "break down catastrophically and with pretty serious[,] problematic results," especially if L.W. was in a stressful situation and mother reacted in a hostile or intrusive manner or father withdrew and became passive. In November 2021, the therapist predicted that "it would be emotionally safe enough for [L.W.] to be unsupervised in the home" by fall of 2022.

The Department petitioned to terminate mother's and father's parental rights and change the foster care goal to adoption because L.W. needed permanency and mother and father were not yet able to resume custody. On December 10, 2021, the JDR court terminated mother's and father's parental rights and approved the foster care goal of adoption. Mother and father appealed to the circuit court.

At the circuit court hearing, the Department presented evidence about the well-being of then-nine-year-old L.W. L.W. had lived with the same foster parents since she entered foster care and was doing well. The assigned foster care worker described L.W.'s relationship with the foster parents as "[v]ery loving, very playful, [and] nurturing."

At the time of the hearing, L.W. had been participating in weekly play therapy. Her therapist worked with her on processing "the trauma of being taken into foster care." L.W. demonstrated "a lot of confusion" about "having to choose . . . between caregivers." In August 2021, L.W. was struggling with transitions, was "more dysregulated," and "quicker to become irritable." She was "emotional[ly] upset for hours after visits." L.W.'s therapist testified that "being in limbo [was] causing her harm" because "[t]here's a lot of stress in not knowing where she's going to be long-term." But by the end of November, her therapist noticed a decrease in L.W.'s anxiety and that she did not have as much difficulty with transitions. The therapist

acknowledged that regardless of the court's ruling, L.W. was "going to experience loss when she achieves permanency."

During the hearing, the foster care worker testified that the Department's "sole" concern was L.W.'s "emotional safety." She explained that L.W. "internalize[d]" her emotions and had no "overt behaviors." She also confirmed that had the family not come to the Department's attention with the "domestic violence and the abuse to the other two children," it probably would not have been contacted about the "emotional safety" issue with L.W. The foster care worker confirmed that the Department did not know of any domestic violence between mother and father since L.W. entered foster care. She admitted that the parents had completed all required services and that the Department believed that the parents' home was appropriate and had no safety concerns.

Father testified that he was ready for L.W. to return home, "the sooner the better." He accepted his role in the situation and believed that he and mother were "in a good space right now." He explained that through therapy, he learned to communicate with mother "in healthy ways" and how to be a better parent. Father also learned in attachment therapy to keep his "eyes and ears open more to seeing the little things" and recognizing the children's cues. He intended to continue with therapy following the hearing.

Similarly, mother testified that she was ready for L.W. to return home. She understood that L.W. entered foster care due to domestic violence and admitted that their household was not "healthy" at that time. She and father lacked good communication skills, and she "had problems at times" with parenting and disciplining the children. Mother testified that her relationship with father had improved with therapy and that she was "[100] percent confident" in her abilities to "emotionally support" L.W. Like father, mother wanted to continue with therapy, regardless of whether L.W. came home.

At the conclusion of the evidence, the Department argued for termination of mother's and father's parental rights, emphasizing that L.W. entered foster care "over three and a half years ago" due to domestic violence in the home. It asserted that mother could not "control her emotions," had "intense reactivity," and blamed others for her situation. Although mother and father had "worked very hard," the Department claimed that therapy had not been "successful" because the parents were still unable to "read [L.W.'s] cues."

Father and mother argued against termination of their parental rights. They emphasized that they had done "everything" that the Department had asked, "willingly engaged in services," and had made "steady and marked progress." Father stressed "the changes in their home" and his therapist's support for a trial home placement. Mother focused on the lack of domestic violence in the home—the initial reason for the foster care placement. She stressed that they "needed time" with L.W. to address all the issues, but the Department refused to expand their visitation, despite the therapists' support. Instead, the Department sought an attachment evaluation, knowing that there was "absolutely no way possible" for the parents to complete it in a "reasonable amount of time." Mother argued that the Department was using their failure to complete the program in "a reasonable amount of time as a basis for terminating their rights."

The circuit court subsequently issued a letter opinion. Acknowledging that the termination of parental rights under Code § 16.1-283(B) or (C)(2) first requires a determination of the best interests of the child, the court considered several factors. The court found that L.W. had been living with the same foster parents for more than three years and that "[n]ot knowing where she will permanently live is affecting [L.W.'s] mental wellbeing." It concluded that it would be "much less disruptive" for L.W. to remain in her foster care placement because she could continue attending the same school and be with her foster parents who wanted to adopt her. The court thus held that termination of parental rights was in L.W.'s best interests.

Next, the court considered that L.W. entered foster care "due to domestic violence between the parents, allegations of physical neglect, and emotional dysregulation by [mother] that resulted in a lack of proper services being implemented." It found that, through therapy, the parents had recognized their roles in the situation, accepted responsibility, and "substantially corrected" the domestic violence. The court observed that the parents "did well with demonstrating their effort and commitment towards reunification" by participating in services, attending visitations, and cooperating with the Department and its service providers. It determined that the "conditions that resulted in the harm to the child have either been eliminated or can be substantially, not perfectly, corrected within a reasonable period of time."

The circuit court thus found that the Department "did not meet [its] burden by showing by clear and convincing evidence that the parents without good cause did not remedy the necessary conditions within a reasonable amount of time." It found that "an additional 6 to 8 months [was] an appropriate time period to give these parents, who have worked so diligently, the opportunity to substantially address their attachment with [L.W.]." The court therefore denied the Department's petitions to terminate mother's and father's parental rights and rejected the foster care goal of adoption.

ANALYSIS

I. Termination of Parental Rights

"On review of a trial court's decision regarding the termination of parental rights, we presume the trial court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 699 (2022) (quoting *Norfolk Div. of Soc. Servs. v. Hardy*, 42 Va. App. 546, 552 (2004)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly

- 8 -

wrong or without evidence to support it." *Simms v. Alexandria Dep't of Cmty. & Hum. Servs.*, 74 Va. App. 447, 470 (2022) (quoting *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011)).

The Department argues that the court erred in finding that the conditions which resulted in harm to L.W. could be substantially corrected or eliminated to allow L.W.'s safe return to the parents within a reasonable period of time under Code § 16.1-283(B)(2). It also asserts that the court erred in denying the termination of parental rights under Code § 16.1-283(C)(2), even though it found that termination was in the best interests of the child and the parents needed more time for treatment.

The Department contends that at the time of the circuit court hearing, L.W. had been in foster care for "nearly" four years, and there were still "concerns" about whether it was "safe" to return L.W. to the parents' custody. The Department argues that it is unreasonable for mother and father to have another six to eight months to resolve those concerns. It emphasizes that the therapists still did not believe that it was safe for L.W. to have overnight visits, much less return home.

"When parents appeal to the circuit court from a final order of the JDR court terminating residual parental rights under Code § 16.1-283, the burden of proof is on [the Department] to demonstrate that the parent's residual parental rights should be terminated." *Bristol Dep't of Soc. Servs. v. Welch*, 64 Va. App. 34, 50 (2014). Under Code § 16.1-283(B), parental rights may be terminated if it is in the best interests of the child and:

> 1. The neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development; and
>
> 2. It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time. In making this determination, the court shall take into consideration the efforts made to rehabilitate

the parent or parents by any public or private social, medical,
mental health or other rehabilitative agencies prior to the child's
initial placement in foster care.

"[S]ubsection B [of Code § 16.1-283] 'speaks prospectively' and requires the circuit court to make a judgment call on the parent's ability, following a finding of neglect or abuse, to substantially remedy the underlying problems." *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 270-71 (2005) (quoting *City of Newport News Dep't of Soc. Servs. v. Winslow*, 40 Va. App. 556, 562 (2003)).

Code § 16.1-283(C)(2) authorizes a court to terminate parental rights if it is in the best interests of the child and:

The parent or parents, without good cause, have been unwilling or
unable within a reasonable period of time not to exceed 12 months
from the date the child was placed in foster care to remedy
substantially the conditions which led to or required continuation
of the child's foster care placement, notwithstanding the
reasonable and appropriate efforts of social, medical, mental health
or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi*, 69 Va. App. at 552 (quoting *Toms*, 46 Va. App. at 271). "Considerably more 'retrospective in nature,' subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services." *Toms*, 46 Va. App. at 271 (quoting *Winslow*, 40 Va. App. at 562).

"'[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by' the United States Supreme Court." *Joyce*, 75 Va. App. at 700 (quoting *Geouge v. Traylor*, 68 Va. App. 343, 368 (2017) (alterations in original)). "This liberty interest of natural parents 'does not evaporate simply because they have not

- 10 -

been model parents or have lost temporary custody of their child to the State. . . . [P]arents retain a vital interest in preventing the irretrievable destruction of their family life.'" *Id.* (alterations in original) (quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)). "[T]he state cannot 'infringe on the fundamental right of parents . . . simply because a state judge believes a better decision could be made.'" *Id.* (alterations in original) (quoting *Welch*, 64 Va. App. at 44). "The termination of parental rights is a 'grave, drastic, and irreversible action.'" *Id.* (quoting *Welch*, 64 Va. App. at 44). "The parent-child relationship is to be preserved whenever possible . . . ." *Welch*, 64 Va. App. at 49.

Here, the Department removed L.W. because of the domestic violence in the household, the allegations of neglect, and the lack of cooperation with services. The Department offered numerous services to the family, including referrals for individual, couples, and family counseling, psychological evaluations, and attachment therapy. Mother and father fully cooperated and consistently participated in the required services. Both parents accepted responsibility for their roles in L.W.'s placement in foster care and testified that, through therapy, they had learned better communication and parenting skills. There were no further acts of domestic violence. And the circuit court found that "the domestic violence ha[d] been substantially corrected" and that there was no "indication of alleged abusive discipline" since the parties participated in individual and family therapy. The record supports the court's finding that "the conditions that resulted in harm to [L.W. had] been substantially corrected or eliminated."

The court further found that mother and father had cooperated with the Department and service providers, kept in contact with the Department, and participated in visitations. It determined that the parents had done "well with demonstrating their effort and commitment towards reunification" with L.W. The therapists noted that mother and father had progressed, and the Department allowed some unsupervised visits. Approximately one year after L.W.

- 11 -

entered foster care, parents' therapists supported a trial home placement. Reluctant to advance to a trial home placement, the Department required the parents to participate in attachment therapy, which admittedly takes "years" for people to complete. The parents cooperated with attachment therapy, but the attachment therapist believed that the parents needed additional time before they would be "ready to emotionally support" L.W.

The court thus found that mother and father had been "willing and able to substantially remedy the conditions that led to or required the continuation of [L.W.] in foster care." Regardless, the court did not find that mother and father were "ready for [L.W.] to return home in an emotionally safe and supportive manner" at the time of the final hearing. The court did determine that the parents "ha[d] worked so diligently" and "an additional 6 to 8 months [was] an appropriate time period to give these parents . . . the opportunity to substantially address their attachment" with L.W.

The court's ruling attempted to preserve mother's and father's relationship with L.W. by giving them time to address the Department's remaining concerns. The General Assembly established a "reasonably presumptive time frame" of 12 months for the parents to substantially remedy the conditions that led to or required continuation of the child's placement in foster care. Code § 16.1-283(C)(2); *see also Joyce*, 75 Va. App. at 705 (quoting *L.G. v. Amherst Cnty. Dep't of Soc. Servs.*, 41 Va. App. 51, 57 (2003)). But courts "may consider evidence before or after the twelve-month time period." *Welch*, 64 Va. App. at 47 (quoting *Thach*, 63 Va. App. at 171).

Here, the court did not err in providing the parents with additional time "to substantially address their attachment" with L.W. Considering the entirety of the record, in the light most favorable to the parents, the circuit court did not err in denying the Department's petitions for the termination of the mother's and father's parental rights.

## II. Best Interests of the Child

Mother and father assigned cross-error to the circuit court's finding that the termination of their parental rights was in the best interests of the child. Under Code § 16.1-283(B) and (C), one of the elements required for the termination of parental rights is that the termination is in the best interests of the child. *See, e.g.*, *Joyce*, 75 Va. App. at 701 (discussing the three findings that a court must make before terminating parental rights under Code § 16.1-283(C)(2)). Because we affirm the court's ruling that the Department failed to meet its burden in proving other elements of Code § 16.1-283, we need not address whether the termination was in the best interests of the child. "We have an 'obligation to decide cases on the best and narrowest grounds available.'" *Theologis v. Weiler*, 76 Va. App. 596, 603 (2023) (quoting *Esposito v. Va. State Police*, 74 Va. App. 130, 134 (2022)).

## CONCLUSION

For the foregoing reasons, we affirm.

*Affirmed.*